United States District Court
District of Massachusetts

```
_____
                          )
Allscripts Healthcare, LLC,     )
                          )
          Plaintiff,      )
                          )
     v.                   )   Civil Action No.
                          )   19-11038-NMG
DR/Decision Resources, LLC,     )
                          )
          Defendants.     )
_____ )
```

MEMORANDUM & ORDER

GORTON, J.

This suit arises out of a contractual dispute between Allscripts Healthcare, LLC ("Allscripts" or "plaintiff") and Decision Resources, LLC d/b/a Decision Resources Group ("DRG" or "defendant"). Pending before the Court is the motion of DRG for summary judgment on the claims in the complaint and the motion of Allscripts for summary judgment on DRG's affirmative defenses and counterclaims II, III and IV.

I.   **Background**

**A.  The Parties**

Allscripts is a healthcare information technology company that purportedly collects, aggregates and de-identifies sensitive patient level data from a network of medical practices

- 1 -

in compliance with applicable privacy and security laws and regulations, _i.e._, the Health Insurance Portability and Accountability Act ("HIPAA").[1]

Allscripts licenses its anonymized data to third party recipients, provided that, among other things, the third party agrees to protect the data and an independent statistician certifies that the data has been de-identified in compliance with HIPAA.

In June, 2014, Allscripts entered into a Master Data License Services Agreement ("the Agreement") with DRG, a healthcare data analytics and consulting company that compiles and repackages licensed data for sale to third parties.

In February, 2018, Allscripts acquired an electronic health records company and subsequently formed a new business unit, Veradigm, which competes directly with DRG.

**B.  Terms of the Agreement**

Several provisions of the Agreement, which is governed by Delaware law, outline the boundaries of DRG's use and disclosure of the data provided by Allscripts.  In Section 3.2, the parties agreed that

---

[1] Patient level data refers to healthcare data about specific patients.

Allscripts hereby grants to [DRG] a limited, revocable non-exclusive license to use the Data [as defined elsewhere in the Agreement] to create analyses, reports and products ("Client Products") using the Data and to commercially distribute such Client Products to its customers.  If the Data is de-identified using a statistician certification, such license is subject to the terms and restrictions set forth in the statistician certificate.  [DRG] shall have no authority, permission, right, or license with respect to the Data except as expressly and explicitly granted to it by Allscripts by the terms of this Agreement.

Section 3.3 limits DRG's rights under the Agreement, providing that

[DRG] shall have no right to and shall not (nor shall it request that any third party) engage in the following: . . . (iii) sell, license, transfer or distribute the Data to any third party other than as permitted under this Agreement. . . .

The Agreement further provides in Section 8.2 that either party can terminate the Agreement if the other party commits a material breach and fails to cure within 30 days after written notice thereof.

## C.  The Statistician Certification

To verify that the data provided under the Agreement complied with the HIPAA Privacy Rule, Allscripts retained Dr. Patrick Baier, who issued a statistician certification ("the Certification") in October, 2014.  Paragraph 22 of the Certification provides that

[DRG] will not provide patient level Allscripts data to a client, either alone or in combination with other data sources.  [DRG] may disclose derivative works such as summaries and analytical results as long as they are not linked to any individuals.

In 2018, Dr. Baier issued a revised certification that contains the same language as the original Paragraph 22.

**D.  Alleged Breach of the Agreement**

In 2016, DRG developed a proprietary data product that linked healthcare data licensed from multiple data suppliers ("the Raven Product").  Although the Raven Product initially linked data licensed from Allscripts and only one additional data supplier, DRG submits that it contained data from as many as nine sources between 2017 and 2019 and has never included data from fewer than two sources.

In October, 2018, Allscripts exercised its right under the Agreement to conduct an audit of DRG's facilities and records on suspicion that DRG had violated the Agreement.  In February, 2019, Allscripts sent a letter to DRG asserting that DRG was in material breach of the Agreement for providing Allscripts' patient level data to DRG customers.  DRG responded that it was acting in accordance with the terms of the Agreement and HIPAA.

DRG avers that it thereafter learned that Allscripts, through Veradigm, "initiated contact with one of DRG's customers" and informed that customer that

> it should be concerned about DRG's sustained ability to sell [electronic health records ("EHR")] data.

DRG submits that Allscripts also falsely notified other DRG customers that "DRG [would] soon lose access to Allscripts' data."

### E.  Procedural History

Mediation proved unsuccessful in May, 2019, and Allscripts filed this lawsuit shortly thereafter alleging 1) violation of the Defend Trade Secrets Act ("DTSA") (Count I); 2) trade secret misappropriation under Massachusetts law (Count II); 3) breach of contract (Count III); 4) unfair and deceptive practices under M.G.L. c. 93A ("Chapter 93A") (Count IV); and 5) fraud in the inducement (Count V).  In April, 2020, Allscripts and DRG stipulated to the dismissal of Count V.

In its answer, DRG counterclaimed for 1) declaratory judgment (Counterclaim I); 2) unfair competition in violation of Chapter 93A (Counterclaim II); 3) false and misleading statements in violation of Section 43(a)(1)(B) of the Lanham Act (Counterclaim III); and 4) breach of contract (Counterclaim IV). DRG also asserted 17 affirmative defenses.

In May, 2019, the parties filed cross motions for preliminary injunctions, both of which were denied.  Allscripts also moved to dismiss DRG's Lanham Act counterclaim but that motion was denied as well.

In April, 2020, both parties moved for summary judgment. DRG sought summary judgment with respect to plaintiff's claims and Count I of its counterclaims, while Allscripts sought summary judgment as to DRG's affirmative defenses and Counts II through IV of its counterclaims.

## II.  **Analysis**

### A.  Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby,

Inc._, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett_, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves_, 994 F.2d 905, 907 (1st Cir. 1993).  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 322-23.

**B.  DRG's Motion for Summary Judgment**

**1. Breach of Contract (Count III)**

To succeed on the breach of contract claim under Delaware law, a plaintiff must show: 1) a contractual obligation, 2) breach of that obligation by the defendant and 3) resulting damage. Terumo Americas Holding, Inc. v. Tureski, 251 F. Supp. 3d 317, 323 (D. Mass. 2017) (citing RoadSafe Traffic Sys., Inc.

v. <u>Ameriseal Ne. Florida, Inc.</u>, No. 09-cv-148-SLR, 2011 WL
4543214, at *13 (D. Del. Sept. 29, 2011)).

As a preliminary matter, Allscripts argues that DRG is not
entitled to summary judgment on Count III because it proffered
evidence that DRG breached the Agreement by allegedly
identifying Allscripts as a provider of data in violation of the
provision in Section 3.3 prohibiting such conduct.  DRG
correctly observes, however, that because Allscripts did not
raise that claim in the complaint, it may not now use it to
defeat summary judgment. <u>See</u> <u>Estrada</u> v. <u>Progressive Direct Ins.</u>
<u>Co.</u>, 53 F. Supp. 3d 484, 497-98 (D. Mass. 2014).

Nevertheless, the Court will address the primary disputes
with respect to Allscripts' breach of contract claim, namely 1)
the extent to which the Agreement incorporates the terms of the
Certification and 2) the scope of DRG's license to use the data
and whether defendant adequately transforms the data in its
Raven Product to avoid the charge that it is merely reselling
raw data.

### a. Incorporation of the Certification

When an executed contract refers to another instrument and
incorporates its conditions, the two will be interpreted
together. <u>Town of Cheswold</u> v. <u>Cent. Delaware Bus. Park</u>, 188 A.3d

810, 818-19 (Del. 2018).  Incorporation requires an "explicit manifestation of intent." Id.  When the parties intend to incorporate a document for a specific purpose, "it becomes a part of the contract for that purpose only" and is otherwise irrelevant. Id.

The parties agree that the Certification was incorporated into the Agreement but disagree as to the extent of that incorporation.  Allscripts contends that its terms were incorporated into the Agreement without limitation, requiring DRG to abide by the provision prohibiting it from providing patient level data to its customers.  For that reason, Allscripts claims that DRG violated the Agreement by including Allscripts' data in the Raven Product.  DRG retorts that the Certification was incorporated for the limited purpose of ensuring compliance with the HIPAA privacy rule and, therefore, its terms cannot affect DRG's rights under the Agreement.

It is clear that the primary purpose of the Certification is to ensure compliance with HIPAA and DRG has proffered evidence demonstrating that the parties intended to incorporate the Certification for that limited purpose.  It notes that Margaret Hogue, an Allscripts' employee who oversaw the acquisition of the Certification, testified that the purpose of the Certification is to "make sure that [Allscripts] is in

compliance with HIPAA and the HIPAA privacy rule." Defendant cites additional testimony of Ms. Hogue, Dr. Baier and Tom Langan, the CEO of Veradigm, indicating that none of them believed that the terms of the Certification could alter the commercial terms of the Agreement. Because the Agreement permits DRG to "use the Data to . . . create products," and because all data provided under the Agreement is patient level data, DRG contends that it is implausible that the parties intended to incorporate a provision that would prohibit DRG from including such data in its products.

In response, Allscripts has proffered facts that render the parties' intent a matter of genuine dispute. It refers to the negotiations with DRG and the terms of the Agreement itself to suggest that the parties intended to incorporate all terms of the Certification, including the apparent prohibition in Paragraph 22. Specifically, Allscripts cites emails sent by DRG in which it "agree[d] to comply with the terms of the [Certification]" and emphasizes that six different provisions of the Agreement provide that DRG's use of the data is subject to compliance with the terms of the Certification.

Although that evidence indicates that DRG was willing to comply with the Certification, DRG emphasizes the qualification

it stated in one of the emails cited by Allscripts, that it would

> comply with the terms of the [Certification], certifying
> that the data delivered to DRG is de-identified in
> compliance with HIPAA.

DRG insists the qualification demonstrates the parties' understanding that the Certification was incorporated solely for HIPAA compliance purposes.

Even if DRG had expressly stated that it would comply with all of the Certification's terms, there is a genuine dispute as to whether the Certification should have included the subject prohibition in the first place. DRG asserts that the document reflects inaccurate information about its contractual rights, pointing to Dr. Baier's declaration in which he states that Paragraph 22 of the Certification "reflected an assumption [he] made" about the parties' commercial relationship based on information provided to him by Allscripts. Allscripts responds that Dr. Baier clarified in a later declaration that Paragraph 22 was based upon information provided to him from both parties rather than by Allscripts alone. DRG notes, however, that Dr. Baier testified at his deposition that he "rel[ied]" on information provided solely by Allscripts, a relevant portion of which Ms. Hogue has conceded was "a mistake, clearly."

Viewing the evidence in the non-movant's favor, the Court concludes that DRG is not entitled to judgment as a matter of law with respect to the alleged breach of the terms of the Certification.  The record reveals that the effect of the Certification on DRG's rights under the Agreement is the subject of an intense and genuine dispute.

### b. Scope of the License and Transformation of the Data

Regardless of whether the terms of the Certification are fully incorporated into the Agreement, the parties also dispute whether DRG contravened its license pursuant to the plain language of Sections 3.2 and 3.3.

When interpreting a contract under Delaware law, the "clear, literal meaning" of a contract's terms should be given effect when those terms

> establish the parties' common meaning so that a reasonable
> person in the position of either party would have no
> expectations inconsistent with the contract language.

NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC, 948 A.2d 411, 418 (Del. Ch. 2007).  When there is uncertainty as to the meaning of contractual language, however, courts should consider extrinsic evidence to determine the intended meaning of the ambiguous terms. Eagle Indus. v. DeVilbiss Health Care, 702 A.2d 1228, 1232 (Del. 1997).  A contract is ambiguous only when the

disputed language is "susceptible to two reasonable interpretations." NAMA Holdings, LLC, 948 A.2d at 418.

DRG contends that Section 3.2 clearly and unambiguously authorizes it to "use the Data to create analyses, reports and products . . . and to commercially distribute" those products to its customers.  It contends that its process of cleaning and normalizing Allscripts' data and linking it to other datasets creates something more valuable than its component parts, thereby constituting a "product."  It has proffered the declaration of Sven Junkergård, DRG's former Chief Technology Officer ("CTO"), who notes that the procedures for "normaliz[ing] and cleaning" the data "may sound trivial" but that the "hundreds of hours" spent processing Allscripts' data are actually "critical" to creating a new product.

Allscripts responds that Mr. Junkergård's declaration is, however, unsubstantiated and misleading.  It dismisses DRG's admittedly "trivial" processing of the data as superficial and asserts that the Raven Product is a mere "vehicle for distributing the Data itself" rather than a new "product using the Data" as contemplated by the Agreement.  Even if the processing were more substantial, Allscripts maintains that Section 3.2 authorizes DRG to create only products that draw

inferences from the licensed data rather than products (such as the Raven Product) that actually contain the data.

Although each party believes the contract language is unambiguous in its favor, the presence of seemingly contradictory provisions and the absence of precise definitions of the disputed terms in Section 3.2, namely "use" and "products," render the contract language ambiguous and subject to conflicting interpretation.

For instance, Allscripts observes that Section 3.3 states that DRG may not

> sell, license, transfer or distribute the Data to any third
> party [or] permit third parties to access to the Data.

Allscripts contends that the sale of the Raven Product is in direct violation of those provisions.  DRG rejoins that the restriction is qualified by the phrase "other than as permitted under this Agreement," and insists that such language would be meaningless if it were not authorized to sell Allscripts' data pursuant to Section 3.2.  To that Allscripts replies that DRG is permitted elsewhere in the Agreement to distribute the data to its employees, subcontractors and independent contractors, demonstrating that the clause cited by DRG would retain meaning even under Allscripts' interpretation.

Having concluded that the language of the license in Section 3.2 is ambiguous, the Court considers extrinsic evidence to determine the parties' intended meaning. <u>See</u> <u>Eagle Indus.</u>, 702 A.2d at 1232.  Yet the extrinsic evidence fails to illuminate the intended meaning and further demonstrates a genuine dispute as to the scope of the license.

Allscripts highlights testimony from Ms. Hogue and Daniel Pucci, a former Allscripts' employee who helped negotiate the Agreement, in which each stated they understood early on that DRG would not be authorized to sell patient level data under any circumstances.  Allscripts then accuses DRG of sending one of its customers a doctored version of the Agreement in which it explicitly added a right to distribute commercially both products and the data itself, suggesting that DRG knew it could not resell the data licensed under the Agreement.

For its part, DRG vehemently denies that it sent out an altered version of the Agreement, emphasizing that the document to which Allscripts refers was attached to an email in which DRG clearly stated that it was intended to summarize the language and rights of multiple agreements.  Furthermore, DRG has presented evidence of an internal instant message conversation from August, 2018, in which Ms. Hogue noted to another Allscripts employee that the Agreement "isn't very clear that

[DRG] CANNOT relicense our data IF it is combined with their other data." That suggests that Allscripts was aware of the ambiguity of Section 3.2 even though it now asserts that the Agreement "unambiguously bars" the marketing of the Raven Product.

Ultimately, this is not a case in which one party asserts a contrived interpretation to create the illusion of a good faith dispute. Instead, both parties have proffered facts supporting reasonable interpretations of ambiguous contractual terms. Because a reasonable jury could return a verdict for either party on Allscripts' breach of contract claim, DRG is not entitled to summary judgment on Count III.

### c. Resulting Damages

DRG also declares that summary judgment is appropriate on Allscripts' breach of contract claim because it cannot establish that it has suffered any damage as a result of DRG's alleged breach. It maintains that Allscripts' allegations of damages are based solely on DRG's alleged noncompliance with the prohibition in the Certification and, because the Certification exists to ensure compliance with HIPAA, any damage must have resulted from a HIPAA violation.

Allscripts has, however, presented evidence from multiple sources indicating that it suffered lost profits due to DRG's sale of Allscripts' data to its customers.  It proffered, <u>inter alia</u>, a declaration and testimony from Stephanie Reisinger, the head of Allscripts' data and analytics business, who testified that customers buying Allscripts' data from DRG would likely have purchased that data directly from Allscripts in the absence of the DRG alternative and that Allscripts would have certainly attempted to secure that business.

In any event, because the existence of damages depends on whether DRG exceeded the scope of its license, which is a matter of genuine dispute, summary judgment will not be allowed on that basis.

### 2. Allscripts' Remaining Claims (Counts I, II and IV)

DRG avers that it is entitled to summary judgment on the remaining counts in Allscripts' complaint.  Those counts include two counts of misappropriation of trade secrets in violation of state and federal law and one count alleging unfair and deceptive trade practices in violation of Chapter 93A.

With respect to Allscripts' claims under the DTSA and Massachusetts trade secret law, the Court observed in a previous memorandum and order that the success of such claims depends on

whether DRG used and/or disclosed the data provided by
Allscripts contrary to the terms of the Agreement. See Docket
No. 41 at 11-12.  Similarly, Allscripts' Chapter 93A claim
depends on whether it can establish that DRG committed an unfair
or deceptive act or practice by including its patient level data
in the Raven Product.

Because the Court has concluded that there is a genuine
dispute regarding the scope of DRG's license and whether the
Raven Product exceeded that scope, summary judgment is
unwarranted on Counts I, II and IV of Allscripts' complaint.

### 3. Declaratory Judgment (Counterclaim I)

Finally, DRG requests that the Court enter summary judgment
on Count I of its counterclaims, in which it seeks a declaration
that it has not breached the Agreement.

As previously noted, whether DRG's Raven Product complies
with the terms of the Agreement is a genuinely disputed issue.
Accordingly, summary judgment on DRG's first counterclaim will
be denied.

### C.  Allscripts' Motion for Summary Judgment

### 1. Admissibility of Evidence Supporting Counterclaims

As a preliminary matter, each of DRG's counterclaims relies
on emails that purportedly indicate that Allscripts employees

used information from a confidential audit of DRG to advise
Point72, a DRG customer, that DRG was improperly selling
products using Allscripts' data.  Allscripts argues that the
proffered emails may not be considered by the Court because they
are inadmissible hearsay.  Accordingly, the Court will assess
the admissibility of the emails before proceeding. See Ferring
Pharms., Inc. v. Braintree Labs., Inc., 215 F. Supp. 3d 114,
120-21 (D. Mass. 2016) ("At the summary judgment stage, the
Court may consider only evidence that would be admissible at
trial.").

DRG concedes that the Point72 emails are hearsay but
asserts that they are nonetheless admissible under either Fed.
R. Evid. 803(1) or (6).

Fed. R. Evid. 803(1) allows the admission of hearsay

> describing or explaining an event or condition, made while
> or immediately after the declarant perceived it.

For that exception to apply, the hearsay statement "must be made
contemporaneously or immediately after the event described."
Taylor v. Erna, No. 08-10534, 2009 U.S. Dist. LEXIS 61612, at
*13 (D. Mass. July 14, 2009).  Although there is "no bright-line
rule indicating what will constitute contemporaneity,"
statements made more than 20 minutes after the relevant event
almost certainly do not meet that standard. See id. at *14-15.

Here, the first email to describe the subject meeting was sent at 4:03 A.M., many hours after the prior day's meeting. DRG has proffered no evidence demonstrating that the particular email or any other was drafted during or immediately after the meeting. Accordingly, Fed. R. Evid. 803(1) is inapplicable.

Fed. R. Evid. 803(6) provides that "[a] record of an act, event, condition, opinion, or diagnosis" is not excluded by the rule against hearsay if it satisfies five requirements.

Allscripts contends that the emails are inadmissible under that exception because the custodial declaration submitted by DRG does not indicate that Point72 imposed a duty on its employees to write the emails. Even assuming that Allscripts is correct about the declaration's insufficiencies, however, the Court is not precluded from considering the emails for that reason. To the contrary, a court may consider evidence on a summary judgment motion unless it "cannot be presented in a form that would be admissible in evidence." Vaks v. LumiraDx, Inc., 2020 U.S. Dist. LEXIS 232882, at *39 (D. Mass. Dec. 11, 2020) (quoting Fed. R. Civ. P. 56(c)(2)). Allscripts has not suggested any reason why DRG would be unable to have the emails admitted into evidence at trial under Fed. R. Evid. 803(6). Accordingly, the emails may be considered at this stage. See id. at *40.

### 2. Chapter 93A Violation (Counterclaim II)

DRG asserts that Allscripts has engaged in unfair competition in violation of Chapter 93A by 1) intending to terminate DRG's access to Allscripts' data provided under the Agreement and 2) making false representations to DRG's customers about its business relationship with DRG.

First, Allscripts contends it is entitled to summary judgment as to the claim that it intended to terminate DRG's access to the data feed.  Because Allscripts did not, and has not, terminated access to the data feed pursuant to the Agreement, DRG cannot show that it has suffered any loss from such alleged intent and summary judgment is therefore warranted. See Shaulis v. Nordstrom, Inc., 865 F.3d 1, 10 (1st Cir. 2017) ("[A] plaintiff must show real economic damages, as opposed to some speculative harm" to recover under Chapter 93A).

Second, Allscripts argues that it is also entitled to summary judgment with respect to the allegations involving false representations because the allegedly unfair acts did not primarily occur in Massachusetts.

Chapter 93A expressly provides that

no action may be brought under the statute unless the complained-of-conduct occurred "primarily and substantially within the Commonwealth."

<u>Monahan Prods. LLC</u> v. <u>Sam's East, Inc.</u>, 463 F. Supp. 3d 128, 151
(D. Mass. 2020) (quoting M.G.L. c. 93A, § 11).  To determine
whether this standard has been met, courts apply a "center of
gravity" test in which the focus should be "solely on the
actionable conduct said to give rise to the violation." <u>Id.</u>  The
defendant bears the burden of establishing that the conduct
occurred outside of Massachusetts. <u>Zyla</u> v. <u>Wadsworth</u>, 360 F.3d
243, 255 (1st Cir. 2004).

Allscripts observes that the pertinent communications took
place in Florida between two companies with principal places of
business outside of Massachusetts.  Although DRG acknowledges
that fact, it insists that "every other aspect of [its] claim
occurred at least in part in Massachusetts."  It states that
several DRG employees based in Massachusetts participated in
conversations regarding the audit request and subsequent price
reduction negotiations between DRG and Point72 and that DRG was
injured in Massachusetts due to Allscripts' conduct.

DRG ignores that the cited conduct does not comprise "the
actionable conduct said to give rise to the violation," on which
the Court must focus its analysis. <u>Monahan Prods. LLC</u>, 463 F.
Supp. 3d at 151.  Furthermore, the fact that DRG sustained
financial injury in Massachusetts is neither controlling nor
worthy of significant weight in this analysis. <u>See</u> <u>New Eng. Gen-</u>

Connect, LLC v. US Carburetion, Inc., No. 16-12270, 2019 U.S. Dist. LEXIS 49302, at *5 (D. Mass. Mar. 25, 2019) ("While [place of injury] may be a factor to be taken account of in particular cases, it is not a general principle that trumps other factors, such as the situs of the loss-producing activity."); Spring Inv'r Servs., Inc. v. Carrington Capital Mgmt., LLC, No. 10-10166, 2013 WL 1703890, at *13 (D. Mass. Apr. 18, 2013) ("As many courts have previously held, a place of injury within Massachusetts is not a sufficient basis for finding that conduct occurred 'primarily and substantially' within the Commonwealth.").

Accordingly, because DRG cannot establish that the complained-of conduct occurred primarily in Massachusetts, summary judgment on Counterclaim II will be allowed.

### 3. Lanham Act Violations (Counterclaim III)

Section 43(a)(1)(B) of the Lanham Act provides that any person who "uses in commerce" any

> false or misleading description of fact, or false or
> misleading representation of fact, which . . . (B) in
> commercial advertising or promotion, misrepresents the
> nature, characteristics, qualities, or geographic origin of
> his or her or another person's goods, services, or
> commercial activities, shall be liable in a civil action by
> any person who believes that he or she is likely to be
> damaged by such act.

15 U.S.C. § 1125(a)(1).

Allscripts asserts that DRG cannot succeed on its Lanham Act claim because, <u>inter alia</u>, the evidence does not establish that the statements made to Point72 constituted "advertising or promotion" under the Act.  It argues that a single statement made to one of DRG's customers cannot be considered an advertisement within the meaning of the Act.

Although the Lanham Act covers more than "classic advertising campaigns," it is nonetheless "aimed at specific forms of communication." <u>Podiatrist Ass'n</u> v. <u>La Cruz Azul de P.R., Inc.</u>, 332 F.3d 6, 19 (1st Cir. 2003).  It is not so broad that it "includes all statements made by one competitor about its or another competitor's product." <u>Gillette Co.</u> v. <u>Norelco Consumer Prods. Co.</u>, 946 F. Supp. 115, 134 (D. Mass. 1996).  To constitute advertising or promotion,

> commercial speech must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals.

<u>Podiatrist Ass'n</u>, 332 F.3d at 19.  Although "a single promotional presentation to an individual purchaser may be enough" to trigger Lanham Act liability where potential purchasers are "relatively limited in number," <u>Seven-Up Co.</u> v. <u>Coca-Cola Co.</u>, 86 F.3d 1379, 1386 (5th Cir. 1996), there is "no indication" Congress intended that the Lanham Act extend to "every isolated alleged misrepresentation made to a potential

customer by a business competitor." <u>Garland Co.</u> v. <u>Ecology Roof</u>
<u>Sys. Corp.</u>, 895 F. Supp. 274, 279 (D. Kan. 1995).

The evidence of record indicates that Allscripts told one
of DRG's customers, Point72, that an audit led it to believe
that DRG was re-licensing raw data in breach of the Agreement.
DRG has presented no evidence of additional statements made by
Allscripts to any of DRG's other 38 customers who purchased the
Raven Product.  As a result, DRG has not demonstrated that
Allscripts' statement was "disseminated sufficiently to the
relevant purchasing public," <u>Ultra-Temp Corp.</u> v. <u>Advanced Vacuum</u>
<u>Sys.</u>, 27 F. Supp. 2d 86, 94 (D. Mass. 1998), to subject
Allscripts to Lanham Act liability.  Although the market for
linked data products is undoubtedly small, it is not nearly as
small as the market at issue in <u>Coastal Abstract Serv.</u> v. <u>First</u>
<u>Am. Title Ins. Co.</u>, 173 F.3d 725 (9th Cir. 1999), in which the
court found that a single representation was sufficient to
trigger Lanham Act liability where the market contained "two or
possibly three" potential customers. 173 F.3d at 735.

DRG submits that "the Court already ruled on this issue"
because it previously held that DRG's allegations about false
representations were sufficient to survive Allscripts' motion to
dismiss.  It does not follow, however, that DRG has proffered
evidence adequate to support those allegations at the summary

judgment stage.  As previously noted, the evidence does not reveal that Allscripts made any false or misleading statements to any of DRG's customers aside from Point72.

Because DRG cannot establish that Allscripts made false representations in "commercial advertising or promotion," summary judgment on Counterclaim III is allowed.

### 4. Breach of Contract (Counterclaim IV)

In its final counterclaim, DRG submits that Allscripts breached Section 5.2 of the Agreement when it allegedly used DRG's confidential information, including the identities of certain customers of DRG, to contact Point72 and report that DRG was in danger of losing access to Allscripts' data.

As noted above, to succeed on the breach of contract claim under Delaware law, a party must show: 1) a contractual obligation, 2) breach of that obligation by the opposing party and 3) resulting damage. Tureski, 251 F. Supp. 3d at 323.

The parties do not dispute the first element and agree that they are each under a contractual obligation pursuant to the Agreement to refrain from using or disclosing the confidential information of the other.  Instead, Allscripts contends that DRG cannot establish either of the other two elements.

Allscripts asserts that DRG cannot prove damages because it has failed to disclose any calculation of damages as required by the Federal Rules of Civil Procedure.

Rule 26(e) requires a party who has responded to an interrogatory to "supplement or correct its disclosure or response" unless the information sought by the interrogatory has "otherwise been made known to the other part[y] during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).  Pursuant to Rule 37, if a party fails to supply information required by Rule 26(e),

> [that] party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).

DRG explains that it had no obligation to supplement its insufficient damages calculation because evidence pertaining to damages was made available to Allscripts during discovery.  It highlights the fact that one witness testified that the damages suffered amounted to approximately $150,000 and another witness testified that was between $50,000 and $1 million.

DRG ignores, however, that its precise computation of damages in the amount of $246,250 is not based on either witness's testimony.  Rather, according to the declaration of Graham Lincoln, the computation is based on the difference between DRG's proposed price for a renewed contract for the Raven Product, that included Allscripts' data, and the amount Point72 actually paid DRG for a renewed contract for the Raven Product, without Allscripts' data.  DRG has not claimed, let alone demonstrated, that such information was made known to Allscripts during discovery or that its failure to produce it was substantially justified or harmless.  As a result, DRG may not now proffer the undisclosed evidence to avoid the stricture of Fed. R. Civ. P. 37(c)(1). See AVX Corp. v. Cabot Corp., 251 F.R.D. 70, 75-80 (D. Mass. 2008) (barring a party from presenting evidence on damages because it failed timely to compute damages in violation of its obligations under Fed. R. Civ P. 26(a)(1)(A)(iii)).

Because DRG cannot establish an essential element of its breach of contract counterclaim, Allscripts' motion for summary judgment will be allowed.

### 5. DRG's Affirmative Defenses

Finally, Allscripts seeks summary judgment with respect to DRG's affirmative defenses because DRG refused to provide the factual and legal bases for each defense in violation of Fed. R. Civ. P. 26(e), which would subject it to preclusion pursuant to Fed. R. Civ. P. 37(c)(1) as described above.

The Court concludes that Allscripts is entitled to summary judgment on DRG's affirmative defenses.  Allscripts propounded an interrogatory to DRG requesting the basis for each of its affirmative defenses but DRG, objecting to the interrogatory as overbroad, unduly burdensome and premature, did not provide any information in support of those defenses.  DRG never supplemented its response as required by Fed. R. Civ. P. 26(e)(1)(A) and, as a result, is subject to the sanction contained in Fed. R. Civ. P. 37(c)(1).

DRG does not claim that its failure to respond to the interrogatory was substantially justified or harmless. Instead, it contends that its failure is excusable because Allscripts never moved to compel a further response, which it argues is required before a court may employ the sanction of Rule 37.  The decision it cites for that

proposition is, however, inapposite because it reversed sanctions imposed under Rule 37(b), which prescribes punishment that may be imposed only for failure to comply with a court order. See United States v. One 1987 BMW 325, 985 F.2d 655, 660-61 (1st Cir. 1993). In contrast, Rule 37(c) does not require a motion to compel and subsequent noncompliance with a court order prior to the imposition of sanctions. See Fed. R. Civ. P. 37(c); Resolution Trust Corp. v. North Bridge Assocs., 22 F.3d 1198, 1206 (1st Cir. 1994) ("[A] discovering party's failure to invoke Rule 37 celeritously will not excuse the guilty party's failure to furnish required discovery in a timely manner.").

DRG also asserts that summary judgment should be denied because the factual bases for each defense were revealed to Allscripts during discovery as permitted by Fed. R. Civ. P. 26(e)(1)(A). In its opposition, DRG mentions only six of its 17 affirmative defenses, and as to those six, it makes no real effort to identify the specific evidence revealed to Allscripts that purportedly establishes the elements of each defense. Consequently, DRG cannot avoid summary judgment on that basis. See GE Capital Healthcare Fin. Servs. v. Fall River Walk-In Emergency Med. Office, No. 02-cv-11789, 2004 U.S. Dist.

LEXIS 75, at *9-11 (D. Mass. Jan. 7, 2004) (allowing

summary judgment on all affirmative defenses where

defendant failed to set forth specific facts or legal

arguments in support of those defenses in its opposition).

Because DRG is precluded from "us[ing] that

information or witness to supply evidence on a motion,"

Fed. R. Civ. P. 37(c)(1), it cannot meet its burden to

present facts showing that there is a genuine issue for

trial.  Accordingly, Allscript's motion for summary

judgment will, with respect to DRG's affirmative defenses,

be allowed.

### ORDER

For the foregoing reasons,

(a)    the motion of defendant Decision Resources, LLC d/b/a

Decision Resources Group ("DRG") for summary judgment

(Docket No. 152) is **DENIED**;

(b)    the motion of plaintiff Allscripts Healthcare, LLC

("Allscripts") for summary judgment on DRG's

affirmative defenses and counterclaims (Docket No.

154) is **ALLOWED**.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated February 22, 2021